## Marcus HUBBARD *v.* STATE of Arkansas

CR 96-1534                                926 S.W.2d 663

Supreme Court of Arkansas
Opinion delivered May 27, 1997

*William R. Simpson, Jr.*, Public Defender, by: *Deborah R. Sallings*, Deputy Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kelly Terry*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Marcus Hubbard was convicted of first-degree murder for the shooting death of Kimble Carroll and sentenced to life imprisonment. He raises three points for reversal, none of which has merit. We affirm.

Hubbard was tried once before for this same offense, but the trial court declared a mistrial because the jury could not reach a verdict. In the second trial, Brenda Bell was the first witness for the State. She testified that she was Kimble Carroll's girlfriend and that on January 12, 1994, she was five months pregnant with his child. On that date at about 11:00 p.m., she and Carroll were in her apartment in North Little Rock and verbally fighting about his consumption of alcohol. Bell decided to leave her apartment and was not wearing a coat. Because it was a cool evening, Car-

roll followed with a coat in hand and tried to convince her to put the coat on and return to the apartment. She testified that by the time the two had walked down the block and crossed the street, Carroll had talked her into returning to the apartment. As they were in the process of returning to the apartment, they saw Hubbard and Marcus Talley on the other side of the street.

Hubbard crossed the street to where Bell and Carroll were standing. He asked the pair what was wrong, and he told Carroll to give Bell the coat he was carrying. Bell then asked Hubbard if he had seen her brother, and Hubbard answered that if he saw her brother, he would tell him that Bell was looking for him. Bell began to cross the street, but Carroll waited because a car was approaching. Marcus Talley in turn began to walk across the street toward Carroll and Hubbard, when Bell heard shots and turned to see Hubbard, standing at arms' length from Carroll and shooting him in the back. She testified that Carroll turned to his assailant and asked: "[W]hat did I do[?]" Hubbard then shot Carroll several more times, after responding: "[Y]ou ain't worth it . . . ." Bell testified that she heard a total of five or six shots and was certain that Hubbard was the trigger man. Hubbard and Talley then ran away.

Marcus Talley also testified for the State. He related that on the evening of January 12, 1994, Hubbard arrived at a mutual friend's house with a .38 caliber revolver. Hubbard and Talley left the house, and as they walked down the street, they approached Bell and Carroll during their altercation. Talley stated that he heard Hubbard tell Carroll to give her the jacket back and heard Bell ask Hubbard to go get her brother. Talley stated that he began walking away from the group when he heard shots. He testified that he heard Carroll exclaim: "[W]hat the hell [is] going on." When he turned to look, he saw shooting and ran. He specifically denied shooting Carroll.

Dr. William Sturner, Chief Medical Examiner at the Arkansas State Crime Laboratory, testified that he performed the autopsy on the victim and stated that five bullets were removed from Carroll's body. He further stated that although Carroll had a blood-alcohol content of .25 percent, he concluded that the cause

of his death was multiple gunshot wounds, which resulted in massive internal bleeding.

Ann Hoff, a criminalist in the Trace Evidence Section of the Arkansas State Crime Laboratory, performed a gunshot residue test on Carroll's coat and determined that Carroll had been shot at least once and possibly twice in the back at close range. She opined that the distance was close enough to be contact shots.

The defense offered testimony from Kimberly Hyams, a licensed psychological examiner. She testified that Bell had been under her care prior to the murder in connection with a suicide attempt that followed a previous miscarriage and that Bell had been prescribed antipsychotic medication. She explained that Bell had been suffering occasional auditory hallucinations, usually in the form of hearing an imaginary baby cry.

Two witnesses testified for the defense that Marcus Talley was carrying a pistol on the night of the murder. Hubbard also testified on his own behalf. He explained that on the night of the shooting, he was 18 years old. He testified that he met Talley that evening, and the two men were walking to a nearby grocery store when they encountered Bell and Carroll, who were having a loud argument. Hubbard explained that he and Talley had decided to leave until Carroll began using profanity. Hubbard stated that Talley was already upset, and he saw Talley turn around and begin shooting Carroll. Hubbard admitted that he fled the scene. He also admitted that he gave a false name to police detectives when he was arrested. He stated that he did this because at that time, he was awaiting sentencing on a guilty plea for possession of cocaine with intent to deliver.

The jury returned a guilty verdict for first-degree murder, and after the sentencing phase, Hubbard was sentenced to life imprisonment.

### I.  Hearsay Statement

For his first point, Hubbard claims that the trial court erred in disallowing his testimony that the victim owed Marcus Talley money. The theory of the case for the defense was that Talley was

the person who shot Carroll. To prove that theory, Hubbard attempted to show a motive based on a debt owed by Carroll to Talley which led to the killing. The following colloquy ensued during Hubbard's direct examination:

> DEFENSE COUNSEL: Why was Mr. Talley upset?
>
> HUBBARD: Because Mr. Carroll owed him some.
>
> PROSECUTOR: Your Honor, I'm going to object at this time. Calls for speculation of the witness.
>
> THE COURT: Approach.
>
> . . . .
>
> DEFENSE COUNSEL: Mr. Talley has told him.
>
> THE COURT: That's hearsay. Sustain the objection.

At this point, the direct examination of Hubbard by defense counsel continued without objection or further comment. Hubbard went on to testify that because Talley was upset, he started shooting Carroll.

Hubbard contends on appeal that the trial court erred in excluding his testimony about what Talley told him concerning Carroll's debt because it was for the purpose of proving motive and ill will on the part of Talley and not to establish the truth of the matter asserted. Hubbard cites us to the case of *Hill v. State*, 314 Ark. 275, 862 S.W.2d 836 (1993), in support of his contention.

We do not reach the merits of this argument. It is a fundamental rule that an issue not raised before the trial court may not be raised for the first time on appeal. *Burton v. State*, 327 Ark. 65, 937 S.W.2d 634 (1997); *Wallace v. State*, 326 Ark. 376, 931 S.W.2d 113 (1996). In this case, the prosecutor objected to Hubbard's testimony about what Carroll owed Talley on the basis that it called for speculation. Defense counsel responded to the speculation argument at the bench conference by asserting that Talley told him about the debt, but the trial court *sua sponte* sustained the prosecutor's objection on *hearsay* grounds. There was no response by defense counsel to the trial court's reasoning and certainly no

arguments concerning motive and whether the questioning constituted hearsay.

These facts bear some of the hallmarks of *Bayless v. State*, 326 Ark. 869, 935 S.W.2d 534 (1996). In *Bayless*, the appellant objected to the testimony of a State witness offered in rebuttal whose identity was not disclosed under Ark. R. Crim. P. 17.1. In response, the State argued that the witness was a genuine rebuttal witness whose name was not required to be disclosed in discovery. Defense counsel offered no response, and the trial court allowed the witness's testimony. On appeal, appellant sought to argue that the witness was not a genuine rebuttal witness. We determined that our consideration of the matter was barred because the appellant had not offered any response to the State's argument at trial.

■ As was the case in *Bayless*, Hubbard now attempts to make an argument to this court that was not made to the trial court, and it was imperative that he do so. Because he never questioned the trial court's ruling, his point is barred from our review.

## II.   Impeachment by Prior Conviction

Hubbard next challenges his impeachment with the prior offense of possession of cocaine with intent to deliver on the basis that undue prejudice resulted from use of that conviction. Prior to trial, Hubbard moved *in limine* to prevent the State from introducing the 1994 felony conviction to impeach his credibility. At that time, the following colloquy took place:

> DEFENSE COUNSEL: I would argue that the prejudicial effect vastly outweighs the probative value.
>
> THE COURT: All right.
>
> DEFENSE COUNSEL: You can look at this transcript [from the previous trial] to see how [appellant] testified and make a ruling as to the importance of his testimony and credibility to the jury. Not only do they have Brenda Bell but this time they have Mr. Talley. So, I'm in the position, as I've told my client, of calling two eyewitnesses liars as opposed to just challenging Miss Bell.

THE COURT: Well, Mr. Talley's going to be impeached with his prior record anyway, with his felony conviction. So, the ruling is consistent. Each can be impeached with felony convictions.[1]

At trial, defense counsel renewed the motion during direct examination of Hubbard, and the motion was again denied.

It is clear that under Ark. R. Evid. 609(a), the State may ask a criminal defendant about prior felony convictions regardless of whether the crime involved an element of untruthfulness. *Smallwood v. State*, 326 Ark. 813, 935 S.W.2d 530 (1996). But for these convictions to be available to impeach credibility, "the probative value of admitting this evidence [must outweigh] its prejudicial effect to a party or a witness[.]" *Turner v. State*, 325 Ark. 237, 242, 926 S.W.2d 843, 846 (1996), *quoting* Ark. R. Evid. 609(a).

The sole question to be answered on this point is whether the impeachment value of the felony conviction was outweighed by its prejudicial impact. This court has explained its standard for review on this question:

> [T]he trial court has considerable discretion in determining whether the probative value of prior convictions outweighs their prejudicial effect, and that decision will not be reversed absent an abuse of discretion. The admissibility of the prior convictions must be decided on a case-by-case basis. When the defendant chooses to testify, this court has consistently permitted prior convictions to be used for impeachment even where those convictions are similar to the charge or charges before the trial court.

*Turner v. State*, 325 Ark. at 242, 926 S.W.2d at 846 (citations omitted). We have further stated that the trial court should consider the following in making its decision: the impeachment value of the prior crime; the date of the conviction and the defendant's subsequent history; the similarity between the prior conviction and the crime charged; the importance of the defendant's testi-

---

[1] In addition to impeachment for a felony conviction for second-degree battery, defense counsel attempted to impeach Marcus Talley with a misdemeanor conviction for possession of marijuana. The trial court disallowed use of the misdemeanor conviction for impeachment purposes.

mony; and the centrality of the credibility issue. *Schalski v. State*, 322 Ark. 63, 907 S.W.2d 693 (1995).

■ Hubbard's argument essentially is that the trial court took a "mechanistic" approach and did not give due consideration to the prejudicial effect of the felony conviction. We disagree. As can be gleaned from the colloquy quoted above, the trial court did consider the prejudicial impact of the cocaine conviction. It is true that Hubbard's conviction for possession of cocaine with intent to deliver is dissimilar to the charge of first-degree murder, but by the same token the cocaine conviction gives no hint that Hubbard had a propensity to commit murder. We also note that the cocaine conviction was recent in time which rendered it more relevant to the issue of Hubbard's credibility, as we recognized in *Schalski v. State, supra*. Finally, Hubbard did not request a limiting instruction that his prior conviction be considered only for impeachment purposes and not as evidence that he committed the murder. *See* AMI Crim. 2d 203. This could well have clarified the matter further for the jury. Considering all of these factors, we conclude that there was no abuse of discretion.

### III.  Instructing the Jury on Parole Eligibility

■ Hubbard's final point relates to the use of AMI Crim. 2d 9402, which instructs the jury on parole eligibility. Hubbard admits, however, that he did not raise this argument to the trial court. As a result, it is barred from our review. *See Burton v. State, supra; Wallace v. State, supra.*

The record in this case has been examined pursuant to Ark. Sup. Ct. R. 4-3(h), and no rulings adverse to Hubbard that constitute prejudicial error have been found.

Affirmed.